Good morning, Your Honors, and may it please the Court, my name is Kelsey Morales with the Alameda County Public Defender's Office. I represent Mr. Mousa Pro Bono, and I'd like to reserve three minutes of my time for Mr. Mousa has twice been granted protection from Egypt, where torture is systemic. In 2021, an IJ granted Mr. Mousa cat deferral, finding that Mr. Mousa is likely to be arrested and detained and subsequently tortured in Egypt. On appeal, the BIA acted as a fact finder and replaced the IJ's decision with its own. This the Board cannot do. In our system, the immigration judge, the trial court, is the fact finder, and its findings are entitled to broad deference from the BIA. Under clear error review, the BIA may only overturn a factual finding where it is illogical, implausible, or without support from the record. Here, the IJ relied on Mr. Mousa's over 20 arrests and convictions over a 10-year period to reasonably infer that Mr. Mousa is likely to attract the attention of Egyptian authorities and be detained. There is nothing illogical about this. The IJ conducted a methodical review of the record, as shown by his five-page, single-spaced summary of Mr. Mousa's contacts with law enforcement. Again, nothing illogical about what the IJ did here. The central question is whether or not the BIA properly reviewed the IJ's factual findings under the proper standard. And it just didn't. Instead, the BIA reviewed the evidence and gave more weight to an outdated fact of Mr. Mousa as a young man over the more recent and overwhelming evidence that he regularly attracts the attention of law enforcement. As this Court has held time and time again, the mere difference of opinion as to how the evidence should be weighed is not a valid basis for reversal under the clear error standard. Ms. Morales, can I ask this? As I understand it, the IJ made two important findings. One is what you just referred to, is that it's more likely than not that he would come to the attention of Egyptian authorities. And the second one, or maybe the subset was, that if he does, and he's likely to be detained and tortured in his detention, as I understand it, the government is not contesting that second finding. It's the first one that is at issue here. Is that correct? Yes, Your Honor. That's my... Yes. I believe that is correct. And we can see that from the Board's decision, where the Board only really takes issue with that first prong, whether or not he's likely, whether or not Mr. Moose is likely to be detained and tortured. And no point is there any, or rather, and they also agree that the evidence showed that police and prison guards engage in torture. There's no discussion as to that second prong. And that's because of, I guess, country-conditioned reports and other evidence that there is systemic torture when someone is detained as a criminal. Exactly. As shown by the State Department reports, the State Department report, the United Nations, and Human Rights Watch, that once someone is arrested, that there's this assembly line of torture, and where torture is done with impunity in Egypt. So the real question that we have here is solely to the first prong, and that's whether or not he's likely to attract the attention of law enforcement. And the Board looked to seven years of Mr. Moose's life as an adult in Egypt, and they gave that more weight than what the Immigration Court looked to, which was over 10 years of contact with law enforcement. And while the Board may be entitled to its own opinion, they may think those seven years are more weighty than the 10 recent years of overwhelming contact with law enforcement, it's not entitled to replace the IJ's decision with its own. As this Court, as the Supreme Court, has noted, if an IJ's, or if a judge's decision is plausible, it really doesn't matter if there's two different ways to view the evidence. We give that deference to the fact finder here. And there is nothing illogical with what the immigration judge did. Judges every day rely on past criminal conduct as predictive for future behavior. We see that in bail hearings, and we see that in discretionary relief. What the Board did is, or sorry, what the immigration judge did is just exactly in line with what judges are told to do and what the Board of Immigration Appeals has counseled immigration judges to do, as to looking to past behavior as predictive of future conduct. If the Board, if we agree with you that the Board abused its discretion in its review of the IJ's decision, what are our options? We can either grant the petition and remand for the Board to reconsider under an appropriate clear air standard, or is the other option to grant the petition and instruct that the relief should be granted? What should we do here? Yes, Your Honor. Here, the Court should find that the record compels Mr. Moussa is likely to be tortured in Egypt. He has met his burden under the cap. He has demonstrated that, for a variety of reasons, he will come to the attention of law enforcement, and when he does, it is more than likely than not that he will be tortured. So this Court, like the court in Soto Soto, should find that the record compels concluding that Mr. Moussa is entitled to cat deferral. What are you basing that on? Is it just his extensive criminal record over the last dozen years? What's compelling the conclusion in this record? Of course, thank you, Your Honor. The immigration judge's decision is grounded in his contact with law enforcement, and he made a reasoned decision here that Mr. Moussa is more than likely to come to the attention of law enforcement through these variety of contacts throughout over 10 years in the United States. But that's not all that we have in this record. He also shows that he is likely to come to the attention of law enforcement due to his faith, his Jewish faith. If he's returned to Egypt, he will be one of less than 10 Jewish people in all of Egypt, as well as to apostate status, and in addition to what is likely to happen as to his mental health, that it will worsen in Egypt, a country where he will have no community support, no practice, his faith, which is integral to his well-being and the stability of his mental health. So the IJ... So those may all be reasons that the IJ's decision should be upheld under a clear standard of review. But isn't it the board's job in the first instance to conduct that review under the proper standard? I mean, it's not... We don't get to review the IJ for clear error, the board does, and our normal practice when the board has not applied the right standard is to tell them to go and apply the right standard. So what is it that makes this case different? What is it that calls for something different from the normal practice here? Yes, Your Honor, in those other cases, for example, the court's case in Gara, the court found that the board's errors were kind of pervasive throughout the opinion, that it applied to acquiescence in the definition of torture. Here we have one central issue, which is whether or not Mr. Moose is likely to attract the attention of law enforcement. There's no question about whether or not if detained it will rise to the level of torture. There's no question as to acquiescence or relocation. It's only on this one factual finding. And the IJ's factual conclusion, the IJ's conclusion is logical, it's reasonable, and it's supported by the record. There is no reason at this point to have it be sent back down to the Board of Immigration Appeals to do this all over again. And this court has found that it can go that next step to find that the record compels finding a cat. And I'll just once again point the court to Soto Soto v. Garland, where that court went that extra step and found that the IJ's findings were logical, and as such, they should have been accepted by the agency. And when they're accepted by the agency, the record compels a conclusion that the petitioner in that case, like Mr. Moosa here, is entitled to cat protection. So, can you help me here? The Board did not question the IJ's finding, and this goes back to Judge Sanchez's, one of the earlier questions. The Board did not question the IJ's finding that if arrested in Egypt, a petitioner would be tortured. But did the Board actually endorse that finding, or did it just not need to address it because of what it said on the question of whether he would be arrested? The Board addressed it. I would point the court to its language where the Board notes that the evidence reflects reported incidents of torture by police and prison guards as a review here of the record of what is likely to happen if Mr. Moosa is detained. They're acknowledging that widespread country, or excuse me, that country conditions evidence proves that next step. Well, I mean, no, I know they acknowledge the evidence, but that's, I mean, it's indisputable that there is evidence of that, but that's not quite the same as saying, and therefore it's more likely than not that the, because you have to show the combined probability that he will be arrested and will be tortured if arrested, that the probability of both of those things happening together has to be greater than 50%. And I guess my question is, do we really have findings from the Board that suffice, even if we agree with you on the question of whether he'll be arrested, do we really have findings from the Board that suffice to compel that conclusion? I think that particular language from the Board's decision addresses that particular point, and the government does not disagree with our framing of the Board's decision. And – Well, they don't, I mean, they don't disagree for purposes of review of, you know, the question of, you know, did they correctly apply the clear air standard? But if we agree with you that they didn't correctly apply the clear air standard, and then the question is, you know, is there any need for a remand, or should we just direct the entry of relief? They obviously don't agree on that. We'll hear from them in a minute, but – I think that language is going to that second prong. And at no point does the Board of Immigration Appeals take any issue with the judges finding that Mr. Moussa is likely to be detained in Egypt. They let that finding stand, and it would be hard-pressed for them, in applying clear air review, to find that the – IJ's decision that Mr. Moussa is going to – is more likely than not to be subject to torture if detained is illogical, implausible, or contrary to the record. But if the – I guess to follow up, if the Board wasn't taking issue with the finding that there's a likelihood of torture once someone is detained, and the government is not briefing that issue itself in its briefing, isn't that issue waived or forfeited? Why would that be sent back if the relevant parties haven't pressed the issue in the first instance? Well, the record, even not on clear air review, on substantial evidence, supports the conclusion that Mr. Moussa is likely to be detained and tortured. There's numerous contrary conditions, evidence, including the Department of State report that says torture is systemic in Egypt. And it's really getting in – you know, that first prong of coming to the attention of law enforcement that is the critical issue here. And I see that – or, sorry – so, but even if you were to disagree with me that it needs to go back to the Board, we would ask that the court order them to review the first prong as – under the clear evidence standard of review. May I ask a – as to your theory on why Egypt would arrest him. Is it because of his U.S. convictions? Or is it the theory that because of his underlying mental illness, he's going to commit a crime again? Yeah. The – I think here, Your Honor, the strongest evidence of what is going to happen is actually an aggregation analysis. What's going to happen to a man, Mr. Moussa, who has lived 15 years of his life in the United States and has gone through a number of traumas – he's been going through a revolving prison door that has an impact on the psyche, on our – on someone's well-being. And what is likely to happen when he is forcibly removed to a country where he has no sort of support system and, you know, is going about his day and is suddenly stopped with a prayer book in his – and, you know, on his person, that is immediately going to bring him to the attention of authorities. And as the expert points out in his report, that that is likely to lead to his arrest and detention. But I – so I think this is one in the aggregate where someone who will have no support, will have no access to his necessary therapies or community or access to his faith, honestly, which has been integral to his – to his well-being, will be thrust into a completely different world that – where it only takes one sort of – one contact with authorities to do it. Well, I understand that's your theory in the aggregate, that there is a melange of different factors. But it seems to me that the IJ was a little more streamlined in its analysis, where it relied on the history of violence and criminality over a dozen years. Not necessarily that it's all these extra things that might – you know, and you may be right, it may play into it as well or implicit in the – in this predictive finding. It may have been those other things. But it seems to me part of the record is just about his propensity for having done this for over a dozen years, that why would it stop once he – once he moves to Egypt, where maybe it's questionable how much mental health he's going to get or it's just in him to do this. Doesn't that seem more reflective of the record than the broader one? And I see my time is running. So just to answer your question, Your Honor, yes, the – that source of risk on its own rises more than the 51 percent. The immigration judge's decision is limited to that – to that prong, as you mentioned. But the board in addressing CAP must address all evidence of harm. So we believe on his – on its own, Mr. Moussa has shown just as the propensity or susceptibility for attracting law enforcement has rised and met his burden, but that there's this whole other wealth of evidence that further supports that he is entitled to CAP protection. Thank you, Counsel. We'll give you a couple minutes for rebuttal. We'll hear from the Attorney General, Mr. Anderson. I think – Good morning, Your Honor. May it please the Court – no, you're not muted, you're – sorry. Good morning, Your Honor. May it please the Court. Eric Anderson representing the Attorney General. Mr. Moussa has been before immigration judges in a number of different postures and has received abundant process before the agency. Nevertheless, due to his frequent contacts with law enforcement and the resulting convictions, the issues before this Court are narrowed to two. First, was his 2017 conviction for assault with force likely to produce great bodily harm, a particularly serious crime, making him ineligible for withholding of removal? And the short answer to this is yes, considering the appropriate factors and proper evidence, the agency did not abuse its discretion in finding that his actions showed that he was dangerous and had committed a particularly serious crime. And second, did he show that it was more likely than not that he will be tortured if returned to Egypt? And here, the answer is no. The Board of Immigration Appeals did not commit any legal error and the record does not compel this Court to reject the findings that he did not make the required showing. To start with the withholding of removal and the particularly serious crime issue, as I stated, this Court is reviewing for abuse of discretion. It will not reevaluate dangerousness or seriousness of the crime. It will merely consider whether the agency considered appropriate factors and proper evidence. And if we look at that evidence, it shows there is agreement between the evidence, findings explicitly made by the immigration judge, and the Board's subsequent decision. And the great bulk of the evidence on this point is the preliminary hearing transcript where Mr. Moussa was represented by counsel who had every motive and made every attempt to shake the testimony of the witness before him. Not only that, but on this record, we have the state judge and Mr. Moussa's counsel basically narrating the videotapes of what he had done in that span of a few minutes in 2017.  In terms of whether the agency considered all the circumstances, including his claim of self-defense, the record shows that they did. The Board's decision is on AR-7, and the immigration judge on this point is on AR-144-145. And here they are in complete agreement. What the immigration judge talked about was that there had been two confrontations, the first of which Mr. Moussa exchanged words with the clerk, the clerk displayed a baseball bat, and Mr. Moussa drew a knife. Then Moussa left the store. Another clerk, with nothing in his hands, approached him, and Mr. Moussa held the exposed blade of a knife within inches of this man's stomach before the man was handed the baseball bat. So the immigration judge considered all these circumstances and decided that the self-defense claim did not demonstrate he was not dangerous. And then, finally, on... I'm sorry to interrupt. Can I move you to the C.A.T. claim and get your views about whether the Board reviewed the I.J.'s determination under a clear error standard? Absolutely, Your Honor. The first thing to notice here is that Mr. Moussa obviously had a number of different reasons or theories why he asked the inference to be drawn, all of which these chains ended in a conclusion, therefore, I'll be tortured in Egypt. And it is very evident that the immigration judge and Board understood that these were separate chains. No one made a confusion that this was one chain which had to be considered all in one. These separate chains were evaluated. The immigration judge obviously rejected three of the four reasons, considering them in the aggregate, and then addressed the fourth one, the possibility that Mr. Moussa would commit crimes, come to the attention of law enforcement, and be detained in Egypt. And this is where the Board disagreed. When the Board applied clear error review, it can reverse the finding if it is illogical and plausible or without support in the record. And it's on that last point, without support in the record, that we think the Board properly applied clear error review. And to draw attention, on page AR-150-24 of the immigration judge's decision, we have two paragraphs in which every sentence, maybe almost every sentence, the immigration judge writes is followed by a citation to record evidence. This is all about conditions in Egypt. And the immigration judge had evaluated this evidence and concluded that torture was a gross violation and occurred frequently in Egyptian detention centers. But on that page, the IJ also says, clearly the respondent is a violent and dangerous individual. His history of arrests and convictions in the United States spans a dozen years. You know, given this history, it is likely he would at some point come to the attention of law enforcement. So what in that is implausible, what in that is implausible or illogical or not supported by the record? Well, exactly, Your Honor, this is where I was going, because this paragraph doesn't have any citations to that, to support that inference. And what we have is, it's a predictive, it's a predictive judgment. It's a predictive judgment about a future event, right? So there obviously can't be a, there's nothing in the record that will tell us, you know, whether it's happened yet, because it's going to happen in the future. And the sentence before does cite the evidence in the record about his past conduct. And so isn't the inference just his future conduct is, you know, his past conduct is a, is likely to predict his future conduct? I mean, that's all the inference is, right? I think, I think this inference is without support for three reasons. First, Mr. Moussa at no point testified that he was afraid he might commit crimes in Egypt. Second, we know from his history in Egypt, he lived there as a grown man for seven years without having any contact with law enforcement. And third, the mental health evaluation by Cole in the section on prognosis states his belief that if Mr. Moussa obtains adequate medical care, it's going to remove all these problems from his behavior. And so all of those show that there is no support for the inference drawn by the immigration judge here. But forgive me, that sounds like weighing of evidence, right? That doesn't seem to be a description of why the IJ's own findings are implausible or unsupported. I mean, I grant you people may look at this differently and decide to weigh things differently. But to counsel's point, it seems as if what the BIA did was weight what had happened to him in Egypt far earlier in the past than what has happened more recently over the last dozen years. Right. And there is no expert. We have expert reports in this case. None of them say Mr. Moussa will commit crimes in Egypt. Mr. Moussa's own testimony does not give any indication that his lawyer is going to argue he's going to commit crimes in Egypt. There is just there is nothing to support the inference. I know the counsel relies on. There is a bit of a difference, and not to interrupt, but the board seemed to say, well, he didn't law enforcement wasn't interested in him for all those years, and therefore they will continue not to be interested in him. But the plain fact is if he's removed because he committed a particularly serious crime in the United States, they're going to know right away that he has committed particularly serious crimes. So he's going to come to the attention of law enforcement right away. And I think that's almost unconsistent. I mean, when you remove somebody, you tell the country to whom they're being removed why you're removing them. And he's being removed because he's committed a particularly serious crime. The theory of cat protection he had put forward as a C4T, which is to say they will get me when I come to the airport is based on his own claim and whether he will be disadvantaged. He never put forward a claim that the Egyptian officials will detain him because he will be reported as having been removed. I should add also, by the way, he is being removed because he failed to establish that his 2004 marriage was bonafide at the time. So this is the stated basis. In fact, it's on the front page of the IJ's decision. Why are you being removed? The charge is that you're admitted as a conditional permanent resident who failed to have those — sorry, your honor, my screen turned off — who failed to have those conditions lifted and therefore his permanent residence expired. So no, your honor, there is a statutory report of the basis for removal. It is not something that would put him at risk before the Egyptian officials. And also, he never exhausted such a claim. It's easy enough to find out because he's all over the public record now. Including this argument. Mr. Anderson, can I ask this? Earlier you stated that — I think you were referencing one of the expert reports — that none of this might happen if he receives adequate mental health treatment. Is there anything in the record to suggest that he would have access to adequate mental health treatment in Egypt such that he would not come to the attention of Egyptian authorities by misbehaving? Right, your honor. Well, right, your honor. We have the immigration judge's findings supported by evidence that there will be no obstacle to his obtaining mental health care in Egypt. But this is the bottom of page 149 where the immigration judge is rejecting the theory that your need for mental health services will expose you to a risk of harm in Egypt. But that's a different point, sorry to interrupt, but that was a point about whether his interaction with mental health services would itself cause torture in those activities. That's a separate point from whether he would receive adequate treatment such that he wouldn't start to act up again. Well, I think there are two — well, maybe three — closely related ideas. I mean, yes, there is a claim, if I'm institutionalized in Egypt, will I be tortured? And this claim is rejected because there's no evidence of a specific intent to do harm when a country has perhaps underfunded or perhaps outmoded means of mental health care. The second is, as someone who will be perceived as Jewish or perceived as an apostate, will they prevent me from getting this care? And this is where I was referring to where the IJ was rejecting this claim. They said, no, there is no indication you would not have access to public services in Egypt on this basis. But it sounds like there's nothing in the record. Maybe you're about to go to this point, but it sounds like there's nothing in the record to suggest that the mental health services in Egypt are robust enough that it would allay the concern that he's more likely than not to come to the attention of Egyptian authorities. Well, I mean, that's the third. Exactly, Your Honor. That's where I was going with that. There we have Cole's prognosis. Cole's prognosis is — it's not about Egypt. I admit, I don't want to misrepresent. Cole is not talking about Egypt. He's talking about with mental health care, these concerns about Mr. Moose's behavior can be alleviated. Before you run out of time, if we were to disagree with you on the question of whether the board correctly applied the clear error standard, what's the appropriate disposition? Right, Your Honor. I do think the remedy is to remand to the board, because when you're evaluating did the board properly apply clear error review, I mean, the board's rationale, its explanation are things that can be considered. And we cite — it's a string citation, so your eyes might run over it, but numerous cases in which the court has remanded after concluding that the board failed to apply clear error review. And in some of them, they explicitly rejected a request to do anything more than remand. And counsel mentioned Soto Soto, so why isn't this case in that camp of just issuing relief? I'm afraid I won't be able to discuss that case in particular, Your Honor, based on my to do a lot more to show that the record compelled the finding in his favor on this. All he needs to prevail is to show that — to persuade the court that the board erroneously applied something other than clear error review. And if the court is persuaded of that, then the board, well, it needs another opportunity to either explain better than I did today why it was really applying clear error review or to address other issues, such as is it going to take issue with the immigration judge's fact-finding about how prevalent torture is in Egyptian detention facilities. I know my review of the record shows that this most often is supported by a reference to people believed to be involved with ISIS or the Muslim Brotherhood, issues that which the Egyptian government might view as a political rival or enemy. I certainly am in no position to say that it does not apply to criminal detainees. My client has not made that finding here. But those are issues that could be addressed on remand as well. I guess one final question for me. I have a hard time seeing why we would remand an issue about the likelihood of torture within detention if that was not an issue that the government pressed in briefing before us. Didn't you — hasn't that been forfeited, essentially? You had an opportunity to — if you had a dispute with whether there's a likelihood of being tortured once someone has come to the attention, wouldn't it have been incumbent for the government to brief that issue before us? I mean, my two-part answer to that is I never disagree with the board's resolution of the case. And second, under a case like the Supreme Court's INS versus Baghamasbad, the board is only required to decide issues sufficient to dispose of the case before it. If it has left certain issues unresolved, then yes, the Supreme Court has said the board gets another chance to address those. Any further questions? Thank you for your argument. Thank you. And we'll hear rebuttal. Three points, Your Honor. As to my friend's comment about Mr. Musa's not saying he's going to commit crimes in the future, or as it relates to Mr. Cole's evaluation of Mr. Musa, that is not the basis that the board relied upon. And it can't be the basis for not finding the board clearly erred in how it reviewed the IJ's factual finding. Two is I think something that should be looked into a little bit is the board's sentence that it's what they call implicit fact-finding, where it's trying to say that Mr. Musa's mental health will not worsen if he's going to Egypt. That particular point, whether or not you find it to be implicit fact-finding or just the board noting on the record, is actually completely separate and apart from the immigration judge's decision that if removed, Mr. Musa is likely to attract the attention of law enforcement. And that's because, as the board, as the immigration judge noted on page 141, he does not attribute Mr. Musa's extensive criminal history to his mental health condition. This is solely a decision made by the immigration judge as to Mr. Musa's extensive contact with law enforcement, not as it relates or can be attributed to his mental health condition. So that prong cannot kind of save the board here. And then third, just in response to my friend's comment that the immigration judge's decision isn't grounded in evidence, I would say it is especially so grounded in evidence. There is a 35-page rap sheet, the five pages of the immigration judge's review of Mr. Musa's criminal contacts, and that is a review of the record evidence of all the criminal court proceedings as well as Mr. Musa's testimony and declaration as to those events. And as well as here, I think it's particularly disingenuous to say that the immigration judge's is not grounded in evidence when the board itself kind of affirmed the immigration's view of Mr. Musa when it denied discretionary relief, when it said that Mr. Musa's contacts with law enforcement were extensive and lengthy and showed an unwillingness to comply with the laws. Here, the board has shown that it agrees with the immigration judge's estimation of Mr. Musa in denying him discretionary relief. They are just looking, in terms of the Catt case, at completely different pieces of evidence and affording them more weight than the immigration judge did. But that is not what they're allowed to do under clear error. They must—that's not what they're allowed to do under clear error. So, Your Honors, I would ask that the court grant the petition, hold that Mr. Musa is entitled to Catt deferral, and at a minimum, remand for the application of the clear review and additional errors made by the agency, including failure to aggregate the risk and properly consider the expert reports. Thank you, counsel. And thank you for your pro bono representation. Thank you both, counsel, for your arguments today. Very helpful to the court. And we will be in recess for conference. We will come back and meet with the students. And it'll take a few minutes for us to get back here. And I'm sure in the meantime, although I haven't asked them, I'm sure our law clerks would like to introduce themselves to you and maybe answer any questions that you have about clerking in the federal system. Thank you.
judges: THOMAS, MILLER, SANCHEZ